IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN L. HOLLAND                :
                                     :
          v.                    :    CIVIL NO. CCB-04-437
                                     :
PSYCHOLOGICAL ASSESSMENT    :
RESOURCES, INC.               ...o0o...

**MEMORANDUM**

This suit arises from a dispute between John L. Holland, Ph.D. ("plaintiff" or "Dr. Holland"), creator of a renowned job search protocol, and his publisher, Psychological Assessment Resources, Inc. ("defendant" or "PAR"), over PAR's publication of an internet version of Dr. Holland's work. Now pending before the court are cross motions for summary judgment; motions by both parties to exclude testimony by the other's expert(s); and the defendant's motion to strike part of the plaintiff's reply memorandum in connection with the plaintiff's motion to exclude. All motions have been fully briefed and are ripe for adjudication; pursuant to Local Rule 105.6, no hearing is necessary. For the reasons set forth below, the plaintiff's motion for partial summary judgment will be denied, and the defendant's motion for summary judgment will be denied in part and granted in part. Only the contract and the Lanham Act claims will go forward; the claims for breach of the covenant of good faith and fair dealing, false light invasion of privacy, unfair or deceptive trade practices, and unjust enrichment will not. The defendant's motion to exclude and motion to strike will be denied. The plaintiff's motion to exclude will be denied without prejudice, as the parties agree it is not timely.

## BACKGROUND

Dr. Holland, a psychologist, developed <u>The Self-Directed Search, A Guide to Educational and Vocational Planning</u> ( "SDS"), a groundbreaking career guide that has been used by over twenty million people and translated into twenty-five languages.  The underlying mechanism by which the SDS provides the test-taker with self-knowledge and guidance is a theory of vocational personalities and work environments.  The SDS poses a series of questions, which, when scored, classify the individual with respect "to six ideal personality types (realistic, investigative, artistic, social, enterprising and conventional)."  Different jobs are also classified using the same categories, permitting the test-taker or her career counselor to assess which occupations are well-suited for her vocational personality type; for instance, an investigative person would fit well with an investigative job as opposed to a conventional one.  The print version of the SDS ("print version")[1] is comprised of three booklets: the <u>Assessment Booklet</u> ("assessment booklet"), <u>The Occupations Finder</u> ("occupations finder"), and <u>You and Your Career</u>.  Four sections of the assessment booklet produce a three-letter "summary code" which is then compared against the score generated by the fifth section, dealing with occupational daydreams ("summary aspiration code"), to create a more complete and accurate profile of the test-taker.  The occupational daydreams section functions in part as a safeguard; in the event that a test-taker's summary code bears no resemblance to the codes for the jobs about which she daydreams, the instructions in the assessment booklet caution her that additional analysis may be necessary.

---

[1] All discussion of the SDS in this case refers to Form R of the SDS; there are three other forms, but as only Form R is at issue in this case, all references to the SDS or versions thereof should be understood as referring to Form R unless otherwise indicated.

Dr. Holland contracted with PAR to publish the SDS, first in 1986 and again in 1989, at which point he entered into the agreement at issue in this case ("the agreement").   Under the terms of the agreement, Dr. Holland transferred his rights in the SDS to PAR, subject to those expressly reserved,[2] in exchange for royalty payments based on PAR's sales of the SDS and related products.   The contractual provision now at the center of this litigation reads as follows: "Publisher [PAR] . . . will publish and print a revised edition of the Original Works[3] [defined elsewhere] . . . as determined by mutual agreement between the Author [Dr. Holland] and Publisher."  (Agreement, Def.'s Mot. Summ. J., Ex. 5 [hereinafter "Agreement"] § II(1).)  A letter from R. Bob Smith, III, Ph.D. ("Dr. Smith"), PAR's chairman and CEO, to Dr. Holland prior to the agreement being signed ("Smith letter"), discussed the insertion of this provision. (Am. Compl., Ex. 3.)  PAR created an internet version of the SDS between 1997-98 and launched it on-line at www.self-directed-search.com in September 1998 without Dr. Holland's consent.[4]  Despite Dr. Holland's continued objections to the internet version of the SDS ("internet version"), PAR has maintained it on-line and attached Dr. Holland's name and biographical information to it .

The internet version varies from the print version in the following ways: the section on

---

[2] PAR thus has "the exclusive right to print, publish, license, sell, and use the Works in all forms and in all media and in any language throughout the entire world subject only to the contractual rights granted by Publisher [PAR] to Author [Dr. Holland] by this agreement." (Agreement, Def.'s Mot. Summ. J., Ex. 5 [hereinafter "Agreement"] § I(2).)

[3] These works ("original works") include "the Self-Directed Search Assessment Booklet, the Self-Directed Search Occupations Finder . . . You and Your Career Booklet [collectively Form R, at issue here]."  (Agreement § II(2)(a).)

[4] PAR did solicit feedback from Dr. Holland and incorporated some, but not all, of his comments.

3

"Vocational Aspirations or Occupational Daydreams" ("occupational daydreams section") in the assessment booklet has been omitted; the complete list and categorization of occupations from the occupations finder are not included; a section on leisure activities has been added; the internet program provides the test-taker with a score report rather than the test-taker calculating her own score, and this report consists only of summary scores, so the test-taker is not exposed to the "origins and derivation of the scores" as with the print version.  In addition, the internet version was not field-tested prior to its release, while the print version was.

On or about January 20, 1999, Dr. Holland filed an initial complaint in the Circuit Court for Baltimore City.  This complaint alleged that the agreement had been breached due to PAR's failure to obtain Dr. Holland's consent and to pay him proper royalties for the internet version. (*See* Compl. Decl. J., Accounting and J., Def.'s Mot. Summ. J., Ex. 10 [hereinafter "Orig. Compl."] at 7-8.)  PAR removed the case on diversity grounds, but this court remanded the case to the Circuit Court for Baltimore City because PAR had not established that more than $75,000 was in controversy, as required by 28 U.S.C. § 1332(a).  The Circuit Court granted PAR's motion to dismiss on the grounds the contract unambiguously stated that Dr. Holland's consent was not required and that PAR had been paying the proper royalties; the Court of Special Appeals affirmed the royalties decision but reversed and remanded on the issue of whether the internet version constituted a revised edition such that Dr. Holland's consent was required for its publication.  (*See Holland v. PAR* (Ct. Spec. App. 2000) (unpublished), Def.'s Mot. Summ. J., Ex. 11 [hereinafter "*Holland I*"]).  On remand, the Circuit Court granted summary judgment for PAR, holding that Dr. Holland's consent was not required and that he had waived his right to seek relief because he continued to accept royalties for the internet version.  The Court of

Special Appeals disagreed, holding that the contract was ambiguous as to whether the internet

version was a "revised edition", thereby precluding summary judgment, and that Dr. Holland's

acceptance of the royalties did not constitute a waiver.  (*See Holland v. PAR* (Ct. Spec. App.

2002) (unpublished), Def.'s Mot. Summ. J., Ex. 12 [hereinafter "*Holland II*"] at 1-2.)  Before the

Circuit Court considered the case for a third time, Dr. Holland amended his complaint to add

claims, including an alleged violation of the Lanham Act, 15 U.S.C. § 1125, and to claim

damages of $1,000,000 plus interest.  Because of the newly pled federal claim, PAR removed the

case in February 2004 to this court, which has jurisdiction over all the claims pursuant to 28

U.S.C. §§ 1331 and 1367(a).[5]

Dr. Holland subsequently amended his complaint an additional time.  The claims

currently pending in the second amended complaint are as follows: breach of contract (count II);

breach of the covenant of good faith and fair dealing (count III); false light (invasion of privacy)

(count IV); unfair and deceptive trade practices[6] (count V); violation of the Lanham Act (count

VI)[7]; and unjust enrichment/restitution (count VII).  Dr. Holland also asks the court to render a

declaratory judgment pursuant to the Maryland Uniform Declaratory Judgments Act, Md. Code

Ann. Cts & Jud. Proc. §§ 3-401, *et seq.* (2006), regarding the breach of contract issue (count I)

and the parties' rights and obligations under the contract (count VIII).  PAR has filed a motion

for summary judgment on all counts, while Dr. Holland asks for partial summary judgment on

---

[5] The court notes, without deciding, that it appears as if the criteria for diversity jurisdiction also are satisfied at this time.

[6] The plaintiff characterizes this claim as being for unfair **and** deceptive trade practices, whereas the applicable law discusses unfair **or** deceptive trade practices, thus the court will use the latter term for all subsequent references.

[7] Dr. Holland seeks injunctive relief under the Lanham Act in addition to damages.

counts I, II, and VIII (the contract claims).  Also pending are cross motions to exclude expert

testimony and the defendant's motion to strike part of the plaintiff's reply brief in support of his

motion to exclude the defendant's expert.

## ANALYSIS

The core conflict in this case is the result of a contract that was entered into before the

rise of the internet.  It does not appear that either party contemplated this revolutionary medium

and, once it emerged in the late 1990s, they bitterly disagreed over how it should be treated

under their agreement.  Roughly eight years of litigation have followed.

### Motions to Exclude and Motion to Strike

In conjunction with examining the substance of the parties' dispute, the court must

resolve the motions pertaining to what evidence it may consider when deciding the cross motions

for summary judgment.  First, Dr. Holland moves to exclude two parts of the report of defense

expert Kathleen A. Bursley, a lawyer who claims expertise in publishing contracts and practices.

As the defendant notes, however, this motion is premature because it has not sought to rely on

Ms. Bursley's expertise in any manner in arguing for summary judgment.  Dr. Holland concedes

as much, yet adds that he has discussed some of Ms. Bursley's report and deposition testimony

in his materials pertaining to summary judgment.  The court will assume Dr. Holland does not

wish to exclude those portions of Ms. Bursley's materials which he himself has included but will

deny without prejudice the motion as it pertains to the rest of her materials subject to the motion

being renewed at such time as the defendant purports to advance her opinion.

Second, PAR asks the court to strike part of the plaintiff's reply brief in support of the

motion to exclude Ms. Bursley.  Specifically, PAR requests that the portion of the brief

discussing the underlying summary judgment dispute be stricken.  As it took the plaintiff less than a page to set forth his pertinent reply to the defendant's opposition– that he agrees with PAR that decision on the motion to exclude should be deferred– the additional discussion of the underlying summary judgment dispute does risk straining the permissible scope of the issues which may be discussed in a reply brief.  It does not, however, so exceed the boundaries of the issues raised in the defendant's opposition that it should be stricken.  In its opposition to the plaintiff's motion to exclude, the defendant states that "the Court need look no further than the Agreement to determine that Dr. Holland's approval rights did not extend to the SDS Form R Internet Version."  (Def.'s Opp'n Pl.'s Mot. Exclude at 3.)  In other words, the defendant characterizes the terms of the agreement as unambiguous, thereby not warranting the consideration of any extrinsic evidence, including expert testimony.  Dr. Holland's response may be seen as an attempt to refute this characterization of the agreement, albeit one which verges on re-arguing his position on the underlying contractual issues.[8]

Third, PAR moves to exclude the expert testimony of Dr. Holland and two other psychologists, Gary Gottfredson, Ph.D. ("Dr. Gottfredson") and Jack Rayman, Ph.D. ("Dr. Rayman") (collectively, "plaintiff's experts").  The defendant offers three grounds for exclusion[9]: the plaintiff's experts "have nothing to offer about the meaning of the term 'revised edition of an Original Work,' as it is used in the Agreement"; they do not have evidence supporting their opinions about the differences between the print and internet versions; and they

---

[8] While this approach reflects a tendency to push the boundaries of prudent motions practice to advance arguments against the other side at every conceivable opportunity, the defendant's motion to strike evinces the same disposition.

[9] PAR does not question the credentials of any of the plaintiff's experts.

also lack any evidence to support their characterization of the internet version as damaging Dr.

Holland's reputation.  (Mem. Supp. Def.'s Mot. Exclude Pl.'s Psychological Experts at 1-2.)

The standard for the admissibility of scientific knowledge is set forth in Rule 702 of the

Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if 1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, the Supreme Court held

that a district court should determine whether the reasoning and methodology underlying an

expert's testimony is scientifically valid and properly can be applied to the facts at issue.  509

U.S. 579 (1993); *see Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769, 772-73 (D. Md. 2002)

(describing this two-part test based on validity of scientific method and relevance to the case

before the court) (internal references omitted).

Applying this test to the defendant's motion, the court holds that the testimony of the

plaintiff's experts relating to the development of the SDS, the theory behind it, and its use as a

clinical tool is admissible.  All three experts have spent decades developing, field-testing, and/or

administering the SDS.  The defendant has not argued that these experiences were not grounded

in sound scientific methods or principles, rather, it argues that these experiences are not relevant

to deciding the central issue in the case: whether the internet version constitutes a revised edition

such that Dr. Holland's consent was required.[10]  As will be discussed below, the definition of

---

[10] The defendant also suggests that because the plaintiff's experts have not done formal tests of the internet version they cannot opine on its differences from the print version or the

"revised edition" seems to be that the work has been substantively changed, and all three experts,

by virtue of their experiences with research about and/or administration of the test, are familiar

with the SDS and equipped to offer an opinion on that topic.[11]

## Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the

motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club*,

---

potential impact of those differences.  To require this would unduly limit the bases on which these experts could testify.  As they have either done tests of or administered the print version countless times, they have a sound scientific basis for their opinions about the print version and, having seen and/or taken the internet version, they can compare the two on the basis of their extensive expertise with the print version.

[11] The court also notes that its consideration of the plaintiff's experts' testimony should not be construed as implying that only psychologists would be considered qualified experts in this case.  As the issues involve a publishing contract regarding a psychological text, it follows that an expert in publishing could be appropriate as well.

*Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witness'

credibility," *Dennis v. Columbia Colleton Med. Ctr.*, *Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002),

but the court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### Contract Claims

Under Maryland law, contracts are interpreted objectively. *See Auction & Estate Reps.*,

*Inc. v. Ashton*, 731 A.2d 441, 444-45, 354 Md. 333, 340-41 (Ct. App. 1999) (internal references

omitted). Clear contractual language will "govern the rights and liabilities of the parties,

irrespective of the intent of the parties at the time they entered into the contract, unless the

written language is not susceptible of a clear and definite understanding . . ." *Slice v. Carozza*

*Prop.*, *Inc.*, 137 A.2d 687, 693, 215 Md. 357, 368 (Ct. App. 1958) (internal references omitted).

A court generally interprets the terms of a written contract as a matter of law; a determination

that these terms are ambiguous is likewise a matter of law. *Ashton*, 731 A.2d at 445. Ambiguity

arises when, to the perception of "a reasonably prudent person in the position of the parties", the

terms are "susceptible to more than one meaning". *Id.* at 446 (internal citations omitted). In the

event of ambiguity, principles of contract construction may be applied. *See*, *e.g.*, *id.* at 445

(explaining that when a "contract is plain and unambiguous, there is no room for construction",

implying that construction may be resorted to when a contract is unclear or ambiguous) (internal

citations and quotation marks omitted).  In addition, to resolve ambiguity and determine the

intent of the parties, a court "will look to evidence from extrinsic sources".  *Fister v. Allstate Life*

*Ins. Co.*, 783 A.2d 194, 203, 366 Md. 201, 216 (Ct. App. 2001) (internal citations and quotation

marks omitted)  A wide variety of extrinsic evidence may be considered, including "dictionaries

or an interpretation of the term employed by one of the parties before the dispute arose," *id.*, and

the history of negotiations, the parties' conduct, and the circumstances surrounding the

contract's execution, s*ee, e.g.*, *Della Ratta*, *Inc. v. American Better Cmty. Developers, Inc.*, 380

A.2d 627, 635, 38 Md. App. 119, 130 (Ct. Spec. App. 1977).   If the extrinsic evidence provided

by the parties

> is, as a matter of law, dispositive of the interpretive issue, [the court may] grant summary
> judgment on that basis . . . If, however, resort to extrinsic evidence . . . leaves genuine
> issues of fact respecting the contract's proper interpretation, summary judgment must of
> course be refused and interpretation left to the trier of fact.

*World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992) (internal

references omitted).  *See also Bd. of Educ. Charles County v. Plymouth Rubber Co.*, 569 A.2d

1288, 1296, 82 Md. App. 9, 26 (Ct. Spec. App. 1990) (explaining that "[o]nly when there is a

*bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the

circumstances is the contract submitted to the trier of fact for interpretation") (internal references

omitted).

At the heart of this case is a conflict over whether Dr. Holland's consent was required

prior to PAR's release of the internet version.  The consent requirement only arises when PAR

seeks to "publish and print a revised edition of the Original Works" ("revisions").  (Agreement §

II(1).)  When PAR instead seeks to publish "all test materials which incorporate the Original

Works" ("incorporations"), Dr. Holland must be afforded an opportunity to "review and

comment" on these materials, but his consent is not required.  (*Id.* at § II(4).)  The defendant

contends that revisions and incorporations are mutually exclusive categories; the plaintiff

disagrees, arguing that an incorporation– by definition– must incorporate some material.  This

incorporated material can either be an original work or a revision, thus an incorporation may

include a revision, which is subject to the consent requirement.  The plaintiff's approach has

merit, as the sub-section setting forth royalties makes a division between original works and

revised editions of original works (*id.* at § II(2)(a)) and original works which are incorporated

into a new product (*id.* at § II(2)(b)).  For the latter category, no mention is made of revised

editions of original works which are incorporated into a new product.  Despite this omission, it

seems logical that PAR would wish to incorporate the most up to date material possible–

revisions– into its new products, implying the existence of a category of materials other than

original works– again, revisions–  which PAR might seek to incorporate, thereby giving rise to a

category of products incorporating revisions which is not specifically defined by the terms of the

contract.

As the two opinions by the Court of Special Appeals implicitly acknowledge, the

categories of revision and incorporation need not be mutually exclusive.  Their reasoning

suggests a somewhat different approach to understanding the potential categories of products

contemplated by the contract.  The distinction between revisions and incorporations appears

twice in the contract, once in sub-sections II(1) and II(4) (distinguishing revisions, for which

consent is needed, from incorporations of original works, for which no consent is needed)

("consent distinction"), and once in sub-section II(2), parts (a) and (b) (distinguishing between

amount of royalties for same) ("royalties distinction").  While these two sets of distinctions may

reference each other, they do not create identical or interchangeable categories, as the defendant would have the court hold. The consent distinction draws a line between "publishing and printing" revised editions of original works (*id.* at § II(1)) and "publishing" incorporations of original works (*id.* at § II(4)). This distinction (in sub-section II(1)) explicitly looks to part of the royalties distinction (sub-section II(2)(a)) for the definition of original works, however, the royalties distinction itself is between original works and "printed" revisions or adaptations of them on the one hand (II(2)(a)), and incorporations of original works into new products on the other (II(2)(b)). The existence of two sets of distinctions– consent and royalties– is reinforced by the format of the contract itself. The consent provisions appear in separate sub-sections, whereas both royalties distinctions appear within the same sub-section, which states that the categories therein are created for calculating royalties. (*See id.* at § II(2)) (stating "Publisher will pay Author royalties for the following categories of products in the following amounts").

The royalties distinction thus fails to address specifically a third category suggested in sub-section II(1): "published" revisions. According to the Court of Special Appeals, which twice held that the contract was ambiguous with respect to the consent issue, the inclusion of the term "publish" in sub-section II(1) is significant: "We reject PAR's contention that Section II(1) is inapplicable because it did not 'print' a 'revised edition' of SDS. Section II(1) is not limited to the print medium only as the contract states that PAR will 'publish **and** print.'" (*Holland* I at 10) (bold in original).[12] Proceeding from the legal premise that "'[i]n the construction of

--------

[12] The Court of Special Appeals did not address the significance of "publish and print" being used rather than "publish or print". On the one hand, the use of "and" suggests that consent is only required when revised editions are printed (literally, run off the printing press) and then published (as in, produced for consumers to purchase). On the other hand, "and" could also suggest that PAR is responsible for both functions– publishing and printing– and when it

contracts, words are to be given their ordinary meaning,'" (*Holland I* at 11) (quoting *Ashton*, 731 A.2d at 446) (internal references omitted), the Court of Special Appeals understands "print" as producing text or graphics on paper or other material using direct or indirect means, which does not describe the dissemination of materials on the internet (*Holland I* at 11-12).  No precise definition of "publish" is given; the assumption seems to be that because it is listed separately from "print", it is used in its broad sense– "to release (a product of creative work) for public distribution or sale," Webster's 3d New Int'l Dictionary (1986)– rather than as a synonym for "print".   This interpretation is consistent with the basic principles of contract interpretation that terms should be understood in their ordinary sense, *see Ashton*, 731 A.2d at 446, and be construed so that none are rendered superfluous, *see State Highway Admin v. David A. Bramble*, *Inc.*, 717 A.2d 943, 948, 351 Md. 226, 237 (Ct. App. 1998).

These same principles compelled the Court of Special Appeals' decision on the royalties issue that was then being litigated (but is not before this court): sub-section II(2)(a) does not

---

engages in either of them to produce a revised edition, consent is required.  This interpretation, which underlies the Court of Special Appeals' opinion, is supported by the format of the contract in two ways.  First, the agreement refers to "publish[ing] and print[ing]" (Agreement § II(1)) rather than "printing and publishing".  Referring first to publishing suggests that it is considered an entirely distinct process from printing, rather than as an adjunct activity to printing.  If it were meant to serve a secondary function– as in, the book is printed (run off the printing press) and then published (released to consumers in some form) – it would be logical to put printing first. Seeking to understand publishing and printing as part of the same package does not make sense if publishing appears first, as it would put the proverbial cart before the horse– something would be published (released on the market in some form) and then printed (reproduced on the page) (*see Holland I* at 11-13) (defining "print").  Second, variants of print and publish appear separately throughout the contract (*see*, *e.g.*, Agreement §§ I(2), II(2)(a), and II(4)), suggesting that they are regarded as distinct processes, each of which is handled by PAR, thus connecting them with an "and" rather than an "or" in sub-section II(1) is meant to provide an inclusive list of activities which result in revisions (and require consent) rather than identify a composite process (printing followed by publishing) so that only when both activities are undertaken with respect to the same material is a revision produced.

apply because it refers to "printed" revisions or adaptations only and the internet version is not

printed.  (*Holland I* at 11.)  Royalties are thus calculated under sub-section II(2)(b) because the

internet version is "a new product sold by PAR that incorporated <u>SDS</u>."  (*Id.* at 13.)  This

conclusion does not necessarily mean that the internet version does not also constitute a

published[13], as opposed to a printed, revision, for which consent may be required.  It only means

that with respect to the royalties distinction, in which the choices are between "printed" revisions

or incorporations into new products, the internet version's non-print status prevents it from

falling into the former category.  It is a non-printed product that draws upon an original work (or,

as the plaintiff points out, a revised edition of an original work[14]), thus coming under the latter

category.  As categorization within the royalties distinction is not dispositive with respect to the

consent distinction, however, a separate determination must be made as to whether the internet

version constitutes a revised edition such that consent is required under sub-section II(1).

       The court is thus presented with two key ambiguities which must be resolved in order to

establish the parties' rights and responsibilities under the contract.  First, the definition of

"revised edition" under the contract is unclear.  Second, once this definition has been

---

[13] When the term "published" is used in this analysis, it should be understood as referring to a means of producing or distributing material in a non-printed fashion or the resulting non-printed material.  It would be most accurate to refer to this category of materials as "published, non-printed", but for the purposes of brevity, the "non-printed" modifier will not always be added.

[14] Technically the internet version seems to incorporate a revised edition of an original work (the 1994 edition) which is not explicitly provided for in the text of the agreement, but given that neither side seems to be contending that consented-to revised editions of original works do not provide a proper basis for incorporations, or that an incorporation of a revised edition would automatically yield another revised edition, this distinction does not alter the underlying analysis.  The question before the court is whether the incorporation of the 1994 edition into the internet version simultaneously resulted in a published revision.

established, is whether the internet version is a revised edition, in which case the consent

provision of sub-section II(1) is triggered.  The first issue may be partially resolved at this time,

but the extrinsic evidence proffered "leaves genuine issues of fact respecting [parts of] the

contract's proper interpretation, [thus] summary judgment must of course be refused and

interpretation left to the trier of fact," *World-Wide Rights Ltd. P'ship*, 955 F.2d at 245 (internal

references omitted), on the second issue.

    The  parties seem to be in agreement that a revised edition is one in which the content has

been substantively changed from previous editions, despite whatever other factors they might

also advance as bearing on the definition of revised edition.  (*See* Pl.'s Mem. Opp'n Def.'s Mot.

Summ. J. and Supp. Pl.'s Mot. Partial Summ. J. [hereinafter "Pl.'s Mem."] at 4-5) (accepting Dr.

Smith's definition of a revised edition being characterized by substantive change and noting that

this definition "matches the understanding of the publishing industry generally"); (*see* Dep. Dr.

Smith, Pl.'s Mot. Partial Summ. J. [hereinafter "Pl.'s Mot."], Ex. 6 [hereinafter "Smith Dep."] at

341-42, 358-60 (Apr. 11, 2006)) (relying on this definition); (*see also* Def.'s Answers Interrogs.,

Pl.'s Mot., Ex. 10 [hereinafter "Def.'s Answers"] at § 2) (stating that "'revised edition' is an

unambiguous term of art in test publishing, and the parties understood exactly what that term

meant").  Substantive, in this context, seems to be used in the sense of "belonging to the essence

of intrinsic nature of the substance." Webster's 3d New Int'l Dictionary (1986).  In other words,

because the plaintiff responds to the defendant's characterization of "revised edition" as a term

with a shared meaning by agreeing with a core component of the definition used by the

defendant,[15] the court will adopt this element–substantive change– as the basis of the parties'

understanding of "revised edition".

The parties are far from agreeing on the second issue, however, which is whether the

internet version constitutes a substantive change from the print version.  The extrinsic evidence

relied upon by each side offers conflicting examples and different analytical frameworks

regarding what changes should be seen as substantive.  The plaintiff contends that the omission

of the occupational daydreams section from the internet version is such a change because its

absence means that the test-taker does not get the documented benefit of comparing the score

from this section with the summary code resulting from the other four sections in the assessment

booklet.  The plaintiff further characterizes the internet version as lacking the essential self-

directed quality of the print version because the test-taker does not score his or her own test, gets

only summary scores, and lacks the full range of jobs listed in the occupations finder to use when

interpreting her results.  Dr. Holland also mentions, but does not focus on in his briefing, that the

internet version contains an additional section on leisure activities and that it was not adequately

field tested prior to its launch.

PAR contends that these changes are not substantive, most significantly because they are

also present in a version of the SDS that is mailed in to PAR for scoring ("mail-in version")

---

[15] The defendant does seek to distance itself from this definition somewhat in its motion
to exclude (*see* Def.'s Mot. Exclude at 8) (referring to Dr. Holland's proposed standard as
"substantive psychological change" and not accepting it), however, it does not disavow the
comments of Dr. Smith– or Ms. Bursley, although the court is not relying on her testimony in its
decision– that substantive change characterizes a revised edition.  Understood in context, this
discussion of Dr. Holland's alleged standard, with the addition by PAR of the modifier
"psychological", relates to the dispute over who may be qualified as an expert on substantive
changes in the SDS, as PAR does not want the court to limit the concept of substantive change to
measurement in psychological terms.

which is listed under sub-section II(2)(b) of the agreement as an incorporation, thus according to

PAR, the internet version must also be an incorporation.  On the one hand, this line of argument

leads to nothing more than what was concluded years ago in *Holland I*: for purposes of the

royalties distinction, the internet version, like the mail-in version, is an incorporation.  On the

other hand, a more interesting argument emerges upon consideration of the fact that inclusion of

the mail-in version in the agreement means it was in existence prior to or at the time the

agreement was entered into,[16] which was well before the time the most recent edition of <u>The SDS

Professional User's Guide</u> ("user's guide")[17], a manual explaining the SDS for career counselors

and other professionals, was released.  The current user's guide is identified on its title page as

the "1994 edition" (which coincides with the date on the most recent printed revised edition but

has a copyright date of 1997).[18]  (*See* <u>The SDS Professional User's Guide</u>, Pl.'s Mot., Ex. 1

[hereinafter "<u>User's Guide</u>"].)  Dr. Holland identifies himself as the primary author of the user's

guide.  (Dep. Dr. Holland, Def.'s Mot. Summ. J., Ex. 2 [hereinafter "Holland Dep. II"] at 74:3-

---

[16] Dr. Holland and Dr. Smith put the release of the mail-in version in 1988, a year before
the agreement was signed.  (Pl.'s Mem. at 18, n.11; Smith Dep. at 275:21-276:4.)

[17] The user's guide, sometimes called the professional manual or user's manual by the
parties, is distinct from the technical manual, to which the parties also make reference.  (*See* <u>The
SDS Professional User's Guide</u>, Pl.'s Mot., Ex. 1 [hereinafter "<u>The User's Guide</u>"] at 9)
(explaining that "[t]he relevant technical information regarding all forms of the SDS is presented
in the SDS Technical Manual.")  Dr. Holland is also credited as the lead author of the technical
manual (*see id.* at 3), and Dr. Smith credits him as having written it (Smith Dep. at 495:8-
497:17).

[18] The reason for the '97 copyright date is unclear.  The technical manual also has a '97
copyright date, which Dr. Holland claims not to have known about, believing it had a '94
copyright date.  (Dep. Dr. Holland, Apr. 10, 2006, Def.'s Mot. Summ. J., Ex. 2 [hereinafter
"Holland Dep. II"] at 82:8-13.)  The reasons for the '97 copyright dates of both the user's guide
and the technical manual do not have to be explored, as this analysis is concerned only with Dr.
Holland's involvement in the creation of the '94 edition of the user's guide.

12, 79:22-80:10 (Apr. 10, 2006)) (stating that he wrote "90%" of the user's guide and again affirming that he wrote it, and although others may have supplied some information, he believed that information was correct)[19] (*See also* <u>User's Guide</u> at cover page) (listing Dr. Holland as the first author of the guide).  While counsel does not ask Dr. Holland specifically if he was the primary author of the '94 edition of the user's guide, it seems clear that Dr. Holland was at least somehow involved in its production.  (*See* Holland Dep. II at 81:15-82:13) (recollecting that "we"– not clear if this refers to Dr. Holland and his colleagues or Dr. Holland and PAR, but either way, Dr. Holland presents himself as involved– produced a new user's guide in 1994.)

The current version of the user's guide ('94 ed., '97 copyright) discusses the original edition of the SDS Form R (published in 1971), followed by discussion of three revised editions ('77, '85, and '94).  (<u>User's Guide</u> at 9-10.)  It does not identify any other materials as revised editions, thereby suggesting that the only products Dr. Holland– as the guide's primary author– considered to be revised editions were the revised print editions identified in the user's guide. Dr. Holland further advanced this view in his deposition; when asked "PAR hasn't published a revised edition since 1994, correct?", he replied, "[n]ot that I know of.  They don't tell me what's going on, you know."  (Holland Dep. II at 90:21- 91:2.)[20]  The mail-in version, although in existence by '94, was not described as a revised edition, but included under the "SDS

---

[19] Although not specified in the transcript, presumably counsel is showing Dr. Holland the most current version of the user's guide, which is also what is attached to each side's summary judgment materials.  Even if he is not, Dr. Holland does not limit his self-proclaimed authorship of the user's guide, except to indicate he is not sure why it has a '97 copyright.  (*See* Holland Dep. II at 90:10-14.)

[20] Dr. Holland also opined that a revised edition should be given a new copyright date (Holland Dep. II at 16:9-15) and later conceded that the copyright dates for the 1994 revised edition and the internet version are the same (*id.* at 99:15-100:6).

19

Software" heading.[21]  (User's Guide at 12-13.)  Dr. Holland in his briefing does not dispute

PAR's characterization of the mail-in version as having the same chief differences from the print

version that the internet version does (Reply Supp. Mot. Summ. J and Opp'n Pl.'s Cross- Mot.

[hereinafter "Def.'s Reply"] at 2-3, 9-10), however, he does claim not to have been aware of

these differences until his deposition (Holland Dep. II at 26:1-14), a statement Dr. Smith

questions (Smith Dep. at 355:13-356:4).

Although there is some appeal to allowing the user's guide– material on which the parties

seem to have agreed prior to the present dispute– to resolve the issue, doing so would over-

simplify the situation.[22]  What constitutes substantive change such that a revised edition results

cannot be understood apart from the medium in which a product exists (printed or published) and

the context in which it was intended to be used.  The mail-in version is in print form and

explicitly intended for professionals to use with clients.  (*See* User's Guide at 12-13; PAR

---

[21] There is also a computer version listed under this heading, which has some but not all
of the same differences from the print version that the internet version has.  Unlike the internet
version, it retains the occupational daydreams section; like the internet version, it lacks self-
directedness, as it is not self-scored, so the user obtains only a summary report and does not look
through the full range of occupations.  In the frequently asked question section of the user's
guide, Dr. Holland (speaking in the first person) states that the computer and print versions are
essentially the same.  (User's Guide at 51.)  If the lack of self-directedness and lack of access to
the complete list of occupations do not render the computer version substantively changed from
the print version, by Dr. Holland's own admission, there does not seem to be a strong argument
that they would constitute such a change in the internet version.

[22] The Court of Special Appeals had the user's guide before it in *Holland II* (*see Holland
II* at 20-21) and did not find it sufficient to decide the issue; granted, it did not also have all the
depositions presently before the court, but as these are not central to interpreting the user's
guide, other than confirming what the user's guide itself says about Dr. Holland being the
primary author, they do not represent a significant addition to understanding the user's guide
such that it could be used as a basis for summary judgment here when it was not so used by the
Court of Special Appeals.

Catalogue of Professional Testing Resources, Pl.'s Mot., Ex. 16 at 227; Smith Dep. at 377:7-15.)   The print format limits its circulation to a smaller audience than the potential audience for the internet version, and its use in conjunction with professional counseling may make a truncated version appropriate– or at least not substantively different from taking the print version absent a counselor– because the counselor or psychologist oversees the process and can provide safeguards to make sure the client's results are proper, thus rendering omission of the occupational daydreams section not a substantive change.   In contrast, the internet version exists in a non-printed format that is readily accessible to millions of potential test-takers around the world and is designed for use without professional supervision, although a link to some information about career counselors is provided. (*See* "Welcome to the Self-Directed Search", [hereinafter "Internet Version Print-Out"], Pl.'s Mot., Ex. 3 (print-out of the internet version).) Omission of the safeguard of the occupational daydreams section, in this context, might indeed be a substantive change because millions of people may be exposed to an abbreviated version of the test where the truncation is not offset by the presence of a counselor.   Viewed comprehensively, the central difference between the print to internet versions (omission of the occupational daydreams section) in some ways goes more to the essence of the SDS than the changes that make up the printed revised editions, which, although greater in number, seem potentially less substantive than dropping an entire section and not correcting for it in any manner.   (*See* User's Guide at 9-10) (listing changes to printed revised editions.)

        In addition to its arguments about the similarities between the mail-in and internet versions, PAR attempts to characterize the omission of the occupational daydreams section as not substantive based on a study ("comparison study") comparing the print, computer, and

internet versions of the SDS. (Def.'s Mot. Summ. J., Ex. 17, Lumsden, Jill A. et al., *A Comparison Study of the Paper-and-Pencil, Computer, and Internet Versions of Holland's Self-Directed Search*, 37 <u>Measurement and Evaluation in Counseling and Development</u> (July 2004) [hereinafter "<u>Comparison Study</u>"].)  The comparison study concludes that the three versions are equivalent in terms of the scores produced (*id.* at 91), but notes that the absence of the occupational daydreams section is an "important practical difference[]" between the internet version and the two others (*id.* at 92).  Dr. Holland responds that it is not surprising that the scores were found to be equivalent because all were derived using the four sections of the assessment booklet present in all three versions– that is, the occupational daydreams section was not used in computing any of these scores.  This conflict over the meaning of the comparison study only reinforces the underlying genuine issue of material fact– namely, whether the occupational daydreams section is part of the essence of the test such that removing it constitutes a substantive change.  On the one hand, if generating the summary score is the essence of the test and omitting the occupational daydreams section does not alter this score, then the omission is not a substantive change; on the other hand, if the essence of the test is more broadly defined to include the process of comparing this score with the score from the occupational daydreams section, then its omission does implicate a substantive change.[23]

In addition to the breach of contract claim, Dr. Holland asks the court to construe the

_____

[23] The court is inclined to agree with Dr. Holland that, while the underlying question is not whether the internet version is better or worse than the paper version, making this comparison could be useful to the trier of fact because a difference in either direction could be evidence that the essence of the SDS has been altered in some way.  As this evidence does not need to be considered to decide the summary judgment issue, however, it will not be further discussed at this time.

contract and declare the parties' rights under it (count VIII).  As one of the contract's central

ambiguities cannot be resolved based on the evidence now before the court, this request will be

denied.

## Additional Claims

*Breach of Covenant of Good Faith and Fair Dealing*

Under Maryland law, a negotiated contract contains an implied duty of good faith and

fair dealing.  *Eastern Shore Mkts*, *Inc. v. J.D. Assocs. Ltd.*, 213 F.3d 175, 182 (4th Cir. 2000)

(internal references omitted).  As the defendant correctly points out, however, Maryland does not

recognize an independent cause of action for breach of the implied contractual duty of good faith

and fair dealing.  *Mount Vernon Props.*, *LLC v. Branch Banking & Trust Co.*, 907 A.2d 373,

381, 170 Md. App. 457, 471-72 (Ct. Spec. App. 2006).  Dr. Holland does not base his claim on

the implied duty of good faith and fair dealing, but on an express contractual provision stating

that "[t]he parties hereto shall deal with one another fairly and in good faith" (Agreement §

V(3)).  This claim should have been characterized as another grounds for breach of contract

rather than as a separate cause of action, which is not available.  *Cf. Mount Vernon Props.*, 907

A.2d 373 at 381-82 (stating that breach of the implied duty of good faith and fair dealing should

be construed as another element of a breach of contract claim).  The allegations of breach of the

covenant of good faith and fair dealing are thus subsumed within the breach of contract claim

(count 1) and will not proceed as an independent cause of action.[24]

*Invasion of Privacy– False Light*

---

[24] The court also examined this contractual provision in an earlier opinion in this case,
*Holland v. PAR*, 2004 WL 1368873 (D. Md. 2004).

Placing an individual "before the public in a false light" is one variation of the more general tort of invasion of privacy. *Ostrzenski v. Seigel*, 177 F.3d 245, 252 (4th Cir. 1999). For liability to attach for a false light claim under Maryland law, "'(a) the false light in which the other person was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other person would be placed.'" *Id.* (internal citations omitted). If the statements on which the claim for false light is based are true, however, the "defendant in a false light case is entitled to judgment as a matter of law." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 318-19, 106 Md. App. 470, 514 (Ct. Spec. App. 1995) (internal references omitted).

Even if Dr. Holland were to have sufficiently pled a claim for false light– an issue the court need not decide for purposes of the present motions[25]– PAR is nonetheless entitled to summary judgment because it is not disputed that the statements on which Dr. Holland's claim is based[26] are true. Not only does Dr. Holland fail to plead that the relevant statements made by PAR were false (*see* 2d Am. Compl. ¶ 42) (alleging that PAR's statements merely *suggest* a falsehood– namely, that Dr. Holland approved the internet version– not that they were in fact false), he concedes their basic veracity during his deposition (*see* Holland Dep. II at 27:3- 32:1)

---

[25] It seems unlikely that the implication that Dr. Holland approved the internet version of the SDS would be "highly offensive to a reasonable person".

[26] It is not clear exactly what these statements are, as the complaint alleges generally that "PAR placed Dr. Holland in a false light by publishing an Internet version of the SDS that Dr. Holland does not approve and by improperly publicizing the Internet version of the SDS," suggesting that publicity in addition to the explanatory text on the website of the internet version itself may have been done. The defendant also refers to marketing and advertising statements, further suggesting the existence of a potentially broad array of statements. As Dr. Holland does not identify any false statements, or refute PAR's assertion that all statements on which the claim rests are true, defining the precise body of statements at issue is not necessary.

(agreeing with, refining, or at least not dismissing as false each statement counsel made about
the SDS, its development, and its uses).  In his brief opposing the defendant's summary
judgment motion and supporting his own, Dr. Holland again fails to characterize any of PAR's
statements as untrue, instead arguing that "one who creates a false impression, even though all of
the statements made may be literally true, is subject to liability" (Pl.'s Mem. at 20), a proposition
for which no Maryland law on false light claims is cited, presumably because this approach is
not consistent with Maryland law on the topic.  Summary judgment on the false light claim
(count IV) will thus be granted for PAR.

<em>Unfair or Deceptive Trade Practices– Statutory and Common Law Claims</em>

The parties are in agreement that Dr. Holland cannot bring suit for unfair or deceptive
trade practices under the Maryland Consumer Protection Act ("Act"), Md. Code Com. Law, §
13-101 *et seq.* (2006), because he is not a consumer of the internet version but the creator of the
materials on which it is based.  *See* Md. Code Com. Law, § 13-101 (defining consumer as "an
actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services,
consumer realty, or consumer credit"); *Penn-Plax*, *Inc. v. L. Schultz*, *Inc.*, 988 F. Supp. 906, 909-
11 (D. Md. 1997) (explaining that a business competitor is not covered by the Act because it is
not a consumer) (internal citations omitted); *Fare Deals Ltd. v. World Choice Travel.Com*, *Inc.*,
180 F. Supp. 2d 678, 692 (D. Md. 2001) (stating that the Act provides "causes of action . . .
limited to 'consumers' purchasing 'consumer' goods or services") (internal citations omitted).
As the plaintiff does not seek to advance his claim under the Act, it will be dismissed.[27]

---

[27] While the defendant seeks summary judgment with respect to all counts, dismissal is
more appropriate here as the plaintiff has effectively abandoned his claim under the Act.

The plaintiff does offer arguments in support of claims under the common law of "unfair competition", however, as the defendant notes, the complaint actually alleges "unfair and deceptive trade practices" under the common law (2d Am. Compl. ¶ 48).  As the plaintiff cannot amend his complaint through subsequent briefing, the court's inquiry is limited to the status of the plaintiff's claim under Maryland common law for unfair or deceptive trade practices.  There does not appear to be any common law cause of action for unfair or deceptive trade practices in Maryland.  *See generally McGraw v. Loyola Ford, Inc.*, 723 A.2d 502, 509-10, 124 Md. App. 560, 575-76 (Ct. Spec. App. 1999) (explaining that legislature passed the Act due to increasing concern over deceptive practices being perpetrated against consumers for which legal protections were "'inadequate, poorly coordinated and not widely known or adequately enforced'") (internal citations omitted).  The plaintiff does not direct the court's attention to any case law identifying such a cause of action, and although the factual allegations giving rise to a claim under the Act may also give rise to claims for additional common law torts, *see id.* at 514 (bringing fraud and claim under the Act based on the same set of underlying facts), they do not appear to give rise to a common law claim for unfair or deceptive trade practices.  If such a cause of action were to exist, presumably many, if not all, claims brought under the Act would also be decided under the parallel common law theory; as the court has not been presented with a single case in which this has occurred, all claims of "unfair and deceptive trade practices" (count V) will be dismissed.

*Unjust Enrichment*

"The general rule is that no quasi-contractual claim [such as unjust enrichment] can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests."  *County Comm'rs of Caroline County v. J. Roland Dashiell &*

*Sons, Inc.*, 747 A.2d 600, 607, 358 Md. 83, 96 (Ct. App. 2000) (internal citations omitted).  This

rule is closely adhered to, and exceptions have been granted "only when there is evidence of

fraud or bad faith,[28] there has been a breach of contract or a mutual recission of the contract,

when recission is warranted, or when the express contract does not fully address a subject

matter."  *Id.* at 608-09.  Dr. Holland seems to be arguing that his claim falls into the last category

by characterizing it as distinct from his breach of contract claim because it is "based on PAR's

promotion and marketing of the Internet SDS in such a way as to confuse consumers and to lead

them to conclude that Dr. Holland created or endorses the product."  (Pl.'s Mem. at 22.)  This

attempt fails, however, both because the agreement between the parties does address marketing

and promotion (Agreement § II(6)) and because Dr. Holland himself reveals in his complaint that

this claim is concerned with the revenue PAR has received from the internet version rather than

on redressing promotional and marketing violations  (2d Am. Compl. ¶ 61).  Whether PAR was

entitled to market the internet version depends wholly on an interpretation of the express

contract between the parties.  PAR is thus entitled to summary judgment on Dr. Holland's claim

of unjust enrichment.

    *Violation of Section 43(a) of the Lanham Act*

        *False Endorsement Theory*

    Section 43(a) of the Lanham Act, as codified at 15 U.S.C. § 1125(a), "generally has been

construed to protect against trademark, service mark, and trade name infringement even though

---

[28] This exception is triggered when fraud or bad faith exists "in the formation of the
contract that would otherwise govern", not when either is perpetrated over the course of
performance.  *See Kwang Dong Pharmaceutical Co. v. Han*, 205 F. Supp. 2d 489, 497 (D. Md.
2002) (internal references omitted).

the mark or name has not been federally registered." *Perini Corp. v. Perini Construction*, *Inc.*,

915 F.2d 121, 124 (4th Cir. 1990) (internal references omitted).[29]  Dr. Holland's claim does not

arise in the typical context of a Lanham Act violation, as he and PAR are not marketplace rivals

but parties to a contract, the terms of which are disputed.  Rather he seeks to proceed under a

"false endorsement" theory, under which courts have found, even in the absence of underlying

business competition between the parties, "a § 43(a) injury where the plaintiffs' voices,

uniforms, likenesses, published words, or names were used in such a way as to deceive the

public into believing that they endorsed, sponsored, or approved of the defendant's product."

*Advanced Res. Int'l, Inc. v. Tri-Star Petroleum Co.*, 4 F.3d 327, 334 (4th Cir. 1993) (internal

citations omitted); *see also Comins v. Discovery Commc'ns*, 200 F. Supp. 2d 512, 522 (D. Md.

2002) (citing *Tri-Star* for this cause of action).  To succeed using a false endorsement theory,

"the plaintiff must prove the likelihood of consumer confusion as the origin, approval or

endorsement of the project," making summary judgment for the defendant appropriate "where

the plaintiff 'cannot possibly show confusion as to the source or sponsorship.'" *Comins*, 200 F.

Supp 2d at 522 (internal references omitted).

　　　　Due to the limited amount of case law on this theory in the Fourth Circuit, the means by

which the likelihood of confusion must be proved is not entirely clear.  Other circuits have

applied their general test for the likelihood of confusion under the Lanham Act to false

---

[29] The relevant part of the statute provides for civil liability for "any person who, in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ." 15 U.S.C.§ 1125(a)(1)(A).

endorsement claims, *see, e.g.*, *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 626-27 (6th Cir. 2000), thus the court will consider the following relevant factors from the Fourth Circuit's seven-part test: "(1) the strength or distinctiveness of the [plaintiff's] mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify . . . (6) the defendant's intent; and (7) actual confusion." *See Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 170-71 (4th Cir. 2006) (listing the factors, noting that not all will be relevant in every case, and stating that not all of the factors must support the plaintiff's position but all relevant ones must be analyzed) (internal citations omitted).

Before applying these factors to the present case, further discussion of what constitutes the plaintiff's "mark" in a false endorsement case is necessary.  In this context, a "mark" is properly seen as the plaintiff's identity.  *See Tri-Star*, 4 F.3d at 334.  There are limits, however, to a plaintiff's protectable identity.  It has been argued that proper false endorsement plaintiffs must be "celebrities", but it seems as if the proper approach to deciding whether a plaintiff has the requisite status is an assessment of whether his or her "persona" has enough "commercial value" to be protected by the Lanham Act.  *See Marketing Prod. Mgmt. v. Healthandbeautydirect.com*, 333 F. Supp. 2d 418, 430 n.7 (D. Md. 2004).  As both parties repeatedly acknowledge Dr. Holland's standing within the field of career testing, the commercial value of his persona seems undisputed.  (*See* Holland Dep. II, 27:3- 28:7) (plaintiff agreeing or not disagreeing with various statements by PAR regarding his stature and that of the SDS).

The status of Dr. Holland's claim under the false endorsement theory hinges in part on the outcome of the underlying breach of contract dispute.  If Dr. Holland's consent was not required for the publication of the internet version because it was not a revised edition, then Dr.

Holland's endorsement or approval of the product is contractually established and, although he may not like the internet version, he has no legal claim that his endorsement or approval has been falsely implied.  If Dr. Holland's consent was required, then publication of the internet version over his objections exceeds the contractual authority granted to PAR, thus his endorsement or approval is not contractually established.

Given that someone using the internet version is greeted with "Welcome to the Self-Directed Search by Dr. John L. Holland" splayed across the top of the homepage, and that clicking on the link entitled "more about the SDS" brings the user to a screen describing how Dr. Holland developed the SDS, and that yet another click, this time on Dr. Holland's name, draws up Dr. Holland's biography and picture (*see* Internet Version Print-Out; *see also* www.self-directed-search.com (last visited on March 27, 2007)), it seems likely the user would believe she is using a product created, endorsed, or otherwise approved by Dr. Holland.  In the event Dr. Holland's consent is contractually established, no confusion could result; in the event Dr. Holland's consent is not established, confusion seems likely to result as the user would believe herself to be using a product made, endorsed, or approved by Dr. Holland when in reality Dr. Holland had not taken any of these actions.  PAR's primary defense, that all of the statements made in connection with the internet version were true, fails because a statement may give rise to a Lanham Act violation if "although literally true, [it is] likely to mislead and to confuse consumers given the merchandising context."  *Mylan Labs.*, *Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993) (internal references omitted).

The circumstances of this case have some similarities to the conflict in *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369 (S.D.N.Y. 2000), in which the baseball player Nolan Ryan

brought a false endorsement claim against the distributor of goods using his name, likeness, and/or signature for selling the goods after Ryan had terminated the parties' licensing agreement. *Id.* at 372-75.  In finding that Ryan had sufficiently pled such a claim, the court explained: "Although post-termination use of a mark alone does not make out a claim for trademark infringement without first creating the likelihood of consumer confusion, this is more often than not a distinction without a difference."  *Id.* at 381.  When a former licensee continues to market products even after the termination of the license, "'the potential for consumer confusion is greater than in the case of a random infringer'" due to the association in consumers' minds between the licensor and licensee.  *Id.* (quoting *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986)).  While Dr. Holland has not at any time terminated his agreement with PAR, if PAR launched the internet version without his consent when consent was required, it was acting outside the scope of the agreement.  The *Ryan* court's rationale on the issue of confusion thus would be applicable and offer further support for Dr. Holland's position that confusion would likely result from the internet version.[30]

In summary, in the event that Dr. Holland's consent was required, he has shown likelihood of confusion sufficient to survive the defendant's motion for summary judgment.

*Statute of Limitations*

PAR argues that Dr. Holland's Lanham Act claim is time-barred.  As the Lanham Act

---

[30] *Ryan* has been characterized as "a claim for unauthorized merchandising, i.e., in express violation of the terms of the grant of authority, of Ryan's 'personality,' indeed, products with the plaintiff's actual name and autograph on them" were sold.  *Marketing Prod. Mgmt.*, 333 F. Supp. 2d at 432.  In this case, Dr. Holland essentially alleges that PAR engaged in "unauthorized merchandising" because it violated the consent requirement and marketed the internet version using his name, picture, and biographical information.

does not contain its own statute of limitations, "courts generally assume that Congress intended that courts 'borrow' a limitations period . . . from an analogous state law." *Lyons P'ship v. Morris Costumes*, *Inc.*, 243 F.3d 789, 796 (4th Cir. 2001) (internal references omitted).  The federal district court of Maryland has in the past borrowed that state's general three-year statute of limitations period for cases brought under the Lanham Act, *see Fischer v. Viacom Int'l*, *Inc.*, 115 F. Supp. 2d 535, 539 (D. Md. 2000); *Mylan Labs.*, *Inc. v. Pharm. Basics*, *Inc.*, 808 F. Supp. 446, 453-54 (D. Md. 1992), *rev'd on other grounds*, 7 F.3d 1130 (4th Cir. 1993).  Because PAR's maintenance of the internet version is continuing, it seems clear that, at a minimum, the statute of limitations does not bar claims for Lanham Act violations that occurred during the three-year period prior to filing of the amended complaint.  *See Lyons*, 243 F.3d at 797.  Further, the alternative doctrine of laches would not in any event bar Dr. Holland's claim for injunctive relief.  *Id.* at 799.  Accordingly, for purposes of the present motion, it is sufficient to say that Dr. Holland's Lanham Act claim is not barred in its entirety, and summary judgment accordingly will be denied.

> ### *Damages*

A brief word about damages under the Lanham Act is in order to respond to the defendant's contention that Dr. Holland's failure to establish proof of harm to his reputation mandates summary judgment on its behalf.   First, monetary damages are not the only remedy allowed by the Lanham Act; a plaintiff also may ask for injunctive relief, which Dr. Holland has, under 15 U.S.C. § 1116(a).  Second, under 15 U.S.C. § 1117(a), which applies in the event a violation under 15 U.S.C. § 1125(a) is established, the plaintiff can recover, subject to the principles of equity, "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3)

the costs of the action." *See Synergistic*, 470 F.3d at 174; *see also Mid South Bldg. Supply of Maryland*, *Inc. v. Guardian Door and Window*, *Inc.*, 847 A.2d 463, 480, 156 Md. App. 445, 473 (Ct. Spec. App. 2004) (stating that "[s]ection 1117(a) makes clear that the unavailability of actual damages as a remedy does not preclude a plaintiff from recovering an accounting of the defendant's profits").  As it cannot be said that Dr. Holland might not have a legitimate claim for at least injunctive relief, lack of proof of actual damages at this point does not require the entry of summary judgment for PAR.

## CONCLUSION

The contract claims and the Lanham Act claim cannot be resolved on summary judgment. Whether the omission of the occupational daydreams section is a substantive change between the print and internet versions, resulting in a revised edition and requiring consent, must be answered by a jury.  As the Lanham Act claim turns in part on the answer to this question, it too must be presented to a jury for resolution.

A separate order follows.


 March 30, 2007                                              /s/ 
Date                                                Catherine C. Blake
                                                   United States District Judge